FILED

2020 Oct-13  AM 10:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JOE B. CALLOWAY and CYNTHIA CALLOWAY d/b/a C-SQUARED FARMS | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 5:18-cv-1356-LCB |
| v. | ) ) ) | |
| OAKES FARMS, INC., | ) | |
| Defendant. | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This lawsuit arises out of an agreement between the plaintiffs, Joe and Cynthia Calloway, d/b/a C-Squared Farms ("C-Squared") and the defendant, Oakes Farms, Inc. ("Oakes"). The Court will explain the agreement in greater detail below, but generally, the parties agreed that, between February 1, 2018, and December 31, 2018, C-Squared would grow various types of produce for Oakes to harvest and sell. However, things did not go according to plan. On August 24, 2018, C-Squared filed a complaint alleging breach of contract (Count I); four counts arising under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499(b)(2) (Count II) and § 499(b)(4) (Counts III-V); breach of fiduciary duty (Count VI); failure to render accounts (Count VII). (Doc. 1). Oakes filed an answer and counterclaim on October 15, 2018, alleging fraudulent inducement (Count I); negligent

misrepresentation (Count II); breach of contract (Count III); breach of fiduciary duty (Count IV); equitable accounting (Count V); and unjust enrichment (Count VI). (Doc. 13).

Each party has moved for summary judgment.  (Docs. 40 and 43).  The motions are fully briefed and are ripe for review.  For the reasons that follow, the Court finds that summary judgment is due to be granted in part and denied in part for both parties.

## I.    Jurisdiction

The Court has jurisdiction over C-Squared's PACA claims pursuant to 28 U.S.C. 1331, as they arise under federal law.  The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. 1367, because those claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  All of the claims arise out of the aforementioned agreement between C-Squared and Oakes.

The Court also has diversity jurisdiction pursuant to 28 U.S.C. 1332, because the parties are citizens of different states, i.e., Alabama and Florida, and the amount in controversy is well over $75,000.  Venue is proper in this District because "a substantial part of the events or omissions giving rise to the claim occurred" in Jackson County, Alabama.

## II.     Background and Undisputed Facts

This case arises out of an agreement between the parties to grow and sell produce, including bell peppers, jalapeno peppers, and eggplant.  The parties began negotiations in late 2017.  In January of 2018, Steve Veneziano, an Oakes employee, emailed a written agreement to Crymes Harrell, C-Squared's farm manager.  Although the agreement was never signed by either party, both subsequently began to perform their respective obligations.  Neither party disputes that a contract was formed.

Under the contract, C-Squared agreed to grow "Bell Peppers/Specialty Peppers/Eggplant" on 140 acres of farmland that it controlled in Chilton and Autauga Counties, and to transport the produce to Oakes's facility in Flat Rock, Alabama.  (Doc. 45-5. p. 1).  Once delivered to the Flat Rock facility, Oakes was to provide "Cooling and Handling including PTI Labeling, [and] Traceback for all product coming to Flat Rock."  *Id.*  Oakes would then sell the produce to third parties.

Among other things, Oakes agreed to provide the seeds for the produce, a planting schedule, labor for harvesting the produce, boxes for shipping, and to act as C-Squared's "exclusive sales agent."  *Id.*  Oakes was to receive an eight percent sales commission.  Additionally, Oakes agreed to "provide a quality control individual to assist with packing/harvesting" and to have Veneziano and other Oakes employees be available for advice and to visit the farm on certain occasions.  *Id.* at 2.  Oakes

also agreed to "provide sales report updates on Fridays for the previous weeks." *Id.* Finally, Oakes was to issue "grower advances" to C-Squared on a bi-monthly basis from April 2018 to September 2018.[1] The July 15, 2018 advance was to be for $50,000 and the remaining advances were to be $25,000. The agreement provided that any further grower advances would be discussed and mutually agreed upon.

In addition to growing the produce, C-Squared agreed to provide "sales access … to [Oakes] for the entirety of the Agreement Period" but had "the right to sell product if deemed necessary." *Id.* at 1. C-Squared was also required to incur all of the transport fees, carry an insurance policy, and maintain "a valid Primus GFS audit for the Farm and Harvesting so that [Oakes] [would be] able to supply product to premium direct retailers." *Id.* at 2.

It is undisputed that Oakes provided the necessary seeds and that C-Squared planted them in April 2018. However, in late May or early June of 2018, C-Squared's farms experienced an unusually large amount rain in part because of a tropical storm. The excess rain caused them to lose some crops, damaged others, and delayed at least one of the harvests. Ultimately, the damage and delays caused the farm to yield less produce than was expected. It is undisputed that C-Squared

---

[1] The contract lists the dates that the advances were due as the 1st and 15th of each month from April to September. Immediately after the September 15th payment, the agreement again lists August 1st as a date when an advance was due. This appears to be a typographical error. However, it would only be relevant in assessing damages.

received an insurance payment to compensate them for some of their losses. Nevertheless, the crop damage resulted in a reduced need for harvesting labor for one of the growing cycles.

Despite the rain, Oakes initially fulfilled its obligation to provide harvesting crews and a quality control individual.  Oakes contracted with a third party, Deep South Harvesting, for the harvesting labor that it was to provide under the contract. However, on July 12, 2018, the quality control individual left the farm and never returned.  The reason for his departure is disputed, but Oakes does not deny that he left and that they did not provide a replacement.  On August 8, 2018, the harvesting crews from Deep South also left and did not return.  There is disagreement as to who instructed them to leave and their reasons for doing so.  However, Oakes does not dispute that the harvesters left, nor does it dispute the fact that Oakes did not provide a replacement crew.  As will be discussed below, Oakes contends that C-Squared waived that requirement prior to filing suit on August 24, 2018, without any notice.

Finally, there is no dispute that Oakes issued the grower advances due from April 1, 2018, to July 1, 2018.  It appears that Oakes advanced half of the money that was due on July 15, 2018, but did not pay the advances that were due on August 1, 2018, and August 15, 2018.[2]  Oaks asserts that it paid other amounts to C-Squared

---

[2] As noted, the complaint was filed in the middle of the contract period.  As such, it alleged only that Oakes failed to pay certain advances that were due before August 24, 2018.

that it was not required to pay under the contract, i.e., advancing money to pay for hourly wages for additional non-harvest farm labor.  However, C-Squared filed this complaint on August 24, 2018, and instructed Oakes to communicate with it only through counsel.  There is also no dispute that the parties' business relationship essentially ended once the complaint was filed and no goods or money changed hands between them after that date.

### III.   Legal Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323.  Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

7

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV.   Discussion

Both parties allege, among other things, that the other breached the contract. The evidence and arguments relating to the alleged breaches are intertwined as will be discussed below.  The Court will first address Oakes's motion for summary

judgment as to C-Squared's claims followed by C-Squared's motion for summary judgment as to Oakes's counterclaims.

### A. C-Squared's alleged breaches of contract

C-Squared alleged that Oakes breached the contract in four ways: (1) by failing to provide adequate quality control assistance; (2) by the unannounced cessation of harvesting; (3) by failing to provide accountings; and (4) by failing to pay scheduled grower advances. According to C-Squared, these instances amounted to a repudiation of the contract by Oakes and excused any further performance on its part.

In its motion for summary judgment, Oakes argues, as it does in its counterclaim, that C-Squared was the breaching party. Oakes contends that C-Squared breached the contract in one of two ways: (1) by treating the contract as continuing after it filed suit but failing to continue performing its obligations; or (2) by repudiating the contract or rescinding without giving Oakes prior notice of the alleged breach and an opportunity to cure. The Court will address each in turn.

### 1. Alleged failure to provide adequate quality control assistance

The contract provided that Oakes would "free of charge provide a quality control individual to assist with packing/harvesting." (Doc. 45-5, p. 2). It is undisputed that the quality control individual, Oscar Garcia, left the farm on or about July 12, 2018, and never returned. It is further undisputed that Oakes never provided

a replacement.  However, C-Squared admits that it never specifically requested that Oakes send a replacement for Garcia.

The Alabama Supreme Court[3] has held that "where there is a contract involving mutual continuing duties on the part of both parties, and one party has breached, but has not repudiated, the contract, it is the duty of the other before rescission to give notice and opportunity to live up to the contract…." *Nelson Realty Co. v. Darling Shop of Birmingham, Inc.*, 101 So. 2d 78, 85 (Ala. 1957).  As noted, C-Squared does not dispute that it never told Oakes that it considered Garcia's departure to violate the terms of the contract.  Further, C-Squared never requested that Oakes send a replacement.  Joe Calloway even agreed that "things [] went more smoothly" after Garcia left and that "transport to Flat Rock was uninterrupted." (Doc. 48-6, Dep. of Joe Calloway, p. 66).  Thus, unless Oakes's failure to replace Garcia was a repudiation of the contract, C-Squared had a duty to give notice and an opportunity to cure.

"'A repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of his obligations under the contract.'" *Cong. Life Ins. Co. v. Barstow*, 799 So. 2d 931, 938 (Ala. 2001), *quoting E. Allan Farnsworth,*

---

[3] "A federal court sitting in diversity, as in this case, must apply the choice of law principles of the state in which it sits.  In determining which state's law applies in a contract dispute, Alabama follows the principle of *lex loci contractus*, applying the law of the state where the contract was formed." *St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 895 (11th Cir. 2009), *citing Cherokee Ins. Co., Inc. v. Sanches*, 975 So.2d 287, 292 (Ala.2007).  The parties do not dispute that the contract was formed in Alabama.

*Contracts*, § 8.21, at 633–34 (1982).   "To renounce a contract, 'a party must demonstrate an intention to refuse performance within the future time allowed by the contract.'"   *Id.*, *quoting Nationwide Ins. Co. v. Nilsen*, 745 So. 2d 264, 268 (Ala.1998).

Even when viewing the evidence in the light most favorable to C-Squared, the Court cannot conclude that Oakes manifested an intention not to perform under the contract when it did not replace Garcia.   In a series of text messages between the plaintiffs' son, Chance Calloway[4], and Veneziano, Calloway acknowledged that Garcia left after some sort of argument between the two as to whether Calloway made racist remarks.   On July 13, 2018, Calloway told Veneziano, "I didn't say 'we don't fuckin (sic) need those Mexicans…. I don't have that kinda (sic) hate towards anybody."   (Doc. 41-11, p. 10)   Veneziano replied, "I wasn't there so I don't know what was said.   Oscar [Garcia] won't go back so working on finding someone else to replace him down there."   *Id.*   The two then continued to discuss various aspects of the harvesting and selling of produce for the next several days.   C-Squared never inquired about a replacement for Garcia and never told Oakes that they considered his departure to be in breach of the contract.   Further, the evidence establishes that the parties continued their business arrangement after Garcia left.   Accordingly,

---

[4] There is no dispute that Chance Calloway was an employee of C-Squared.  Further, the plaintiffs make no argument that he lacked the authority to engage in the relevant conduct.

there is no genuine issue of material fact as to whether Oakes repudiated the contract by failing to replace the quality control individual.

Additionally, even if Oakes can be said to have breached the contract by failing to replace Garcia, there is no dispute that C-Squared failed to give them notice of the breach and an opportunity to cure.  Thus, summary judgment is proper insofar as C-Squared alleged that Oakes breached the contract by failing to find a replacement for the quality control individual.

### 2.  Alleged unannounced cessation of harvesting

C-Squared also contends that Oakes breached the contract when it failed to find replacement harvesting labor after Deep South left the farm.  In its motion for summary judgment, Oakes asserts that C-Squared waived this requirement.  C-Squared did not address this contention in its response.  Nevertheless, the Court finds that the evidence supports Oakes's assertion.

"A waiver consists of a voluntary and intentional surrender or relinquishment of a known right and the burden of proof in establishing a waiver rests upon the party asserting the claim.  Whether there has been a waiver is a question of fact" *Bentley Sys. v. Intergraph Corp.*, 922 So. 2d 61, 92 (Ala. 2005)(internal quotations and citations omitted).  In the same string of text messages referenced above, Chance Calloway and Veneziano continued to discuss the ongoing harvest and the fact that

the weather had caused the yield to be lower.  On August 7, 2018, Calloway said to

Veneziano:

> We got to thinking and the way it's looking we think we only need one crew. Our thinking is we won't be able to keep both crews busy. Picking will be slow for a few weeks and with close to 40 guys they'll work theirselves (sic) out of hourly work in a weeks time.  It's not that we aren't happy with either crew, they've worked great but we just don't think we can keep them busy.  We can work them to the end of this week.  Who needs to make that call?  Your thoughts?

(Doc. 41-11, p. 30).  Veneziano replied that the decision would be made by "Jay", a

Deep South employee.  *Id*.

A few minutes later, Calloway informed Veneziano that one of the crews

would be leaving the next day.  The next morning, Calloway stated that "Jay is telling

David's crew they have to leave as well."  *Id.* at 32.  When Veneziano asked what

was going on, Calloway replied, "[Jay] pulled both crews out.  We needed one crew

to stay and both were pulled."  *Id.* A few hours later, Veneziano replied, "I'm calling

around now for different folks.  Oscar has a line on a 16 person crew in Georgia[,]

hopefully can snag them."  *Id.*  However, Calloway then responded that he had a

crew of 15 people coming a few days later, and that they would suffice "for a little

while."  *Id.*  Veneziano replied that C-Squared would eventually need approximately

30 harvesters to which Calloway replied, "But we don't need that many at the

moment."  *Id.*

Veneziano agreed and stated, "Just unfortunate crop circumstances[.]  [It's] no ones fault."  *Id.*  The following exchange then occurred:

> [Calloway]: After stringing and steaking (sic) gets caught up our local people can pick as well.
>
> [Veneziano]: Yeah so 31 plus local is plenty man[.]  It may not be a bad thing this happened honestly.
>
> [Calloway]: I was implying not counting that other 16.  Won't shut the door on it of course.  But 15 with out 18-20 locals, you think that's enough?
>
> [Veneziano]: Yeah sure.  That's cool.
>
> [Calloway]: I don't want to close any doors though.
>
> [Veneziano]: I think we stand pat for now and if you see a storm brewing with product we'll make alternate plans and get some more.

(Doc. 41-11, p. 33-34).  The Court finds that these text messages support Oakes's contention that C-Squared affirmatively waived, at least temporarily, Oakes's obligation to provide harvesting crews beginning on August 8, 2018.

As noted, C-Squared filed the complaint in this case on August 24, 2018.  In its response to Oakes's motion for summary judgment, C-Squared does not address the waiver argument and points to no facts demonstrating that it ever requested Oakes to find a replacement crew before it filed suit.  Further, counsel for C-Squared sent an email to Veneziano stating that "any and all communications concerning this case are to be directed to counsel and not C-Squared Farms.  To avoid any confusion, demand is hereby made upon you and Oakes Farms to refrain from communicating with anyone at C-Squared Farms in any manner."  (Doc. 48-2, p. 100).  The email

was dated August 24, 2018, and clearly expressed C-Squared's desire that Oakes cease all communications.  Thus, C-Squared undoubtedly waived any continuing requirement for Oakes to provide harvesting labor after that date.

Even viewing these communications in the light most favorable to C-Squared, the Court finds no genuine issue of material fact as to whether C-Squared waived Oakes's obligation to provide harvesting labor past August 8, 2018, and there is no dispute that Oakes provided the labor prior to that date.  Accordingly, the Court finds that Oakes was not in breach of the contract when it failed to replace the harvesting crews that left on August 8, 2018, and, consequently, did not repudiate the contract on that basis either.  Thus, C-Squared had a duty to provide notice and an opportunity to cure prior to rescission but failed to do so.  Accordingly, insofar as C-Squared alleged that Oakes breached the contract by failing to provide a replacement harvesting crew, summary judgment is due to be granted on that claim.

### 3.  Alleged failure to provide accountings

Next, C-Squared alleged that Oakes breached its contract by failing to provide weekly sales accountings.  (Doc. 1, p. 13-14).  In its motion for summary judgment, Oakes correctly notes that the contract obligated Oakes to provide "sales report updates on Fridays for the previous week," and not "accountings."  (Doc. 45-5, p. 2).  While Oakes does not dispute that it did not provide reports every Friday, it asserted that Veneziano sent at least seven communications via text message

between June 25, 2018, and August 21, 2018, informing C-Squared "as to the status of sales and pricing." (Doc. 42, p. 41-42). The evidence supports this assertion.

As in the issues discussed above, C-Squared has pointed to no evidence indicating that it put Oakes on notice that it considered the lack of reports every Friday a breach of the contract. The record likewise contains no demands that such reports be sent. Rather, as Oakes points out, the parties regularly communicated during the harvest period, mostly via text message, regarding the produce that was being harvested and sold. Therefore, the Court does not find that Oakes's failure to send reports every Friday constituted a repudiation. *See Cong. Life Ins. Co. v. Barstow*, 799 So. 2d 931, 938 (Ala. 2001). Consequently, C-Squared had a duty to provide notice and an opportunity to cure before it could rescind its obligations under the contract on this basis. Accordingly, insofar as C-Squared alleged that Oakes breached the contract by failing to provide proper sales reports, summary judgment is due to be granted in favor of Oakes.

### 4. Alleged failure to pay grower advances

Finally, C-Squared alleged that Oakes breached the contract when it failed to pay grower advances as scheduled. According to C-Squared, Oakes's failure to pay grower advances amounted to a repudiation of the contract. In order to properly resolve this claim, the Court must determine whether Oakes merely breached the contract or whether it repudiated the contract. If its failure to make the required

grower advances was a mere breach, then C-Squared was required to give notice and an opportunity to cure as discussed above.  Unless C-Squared did that, it would not be excused from further performance.  However, if the failure to pay grower advances was a repudiation, C-Squared had no such duties and was excused from further performance.

### a. Whether Oakes repudiated the contract

The Court finds that there is no genuine dispute as to whether Oakes repudiated the contract by failing to make the grower advances in July and August of 2018.  As noted above, "'[a] repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of his obligations under the contract.'"  *Cong. Life Ins. Co. v. Barstow*, 799 So. 2d 931, 938 (Ala. 2001), *quoting E. Allan Farnsworth, Contracts*, § 8.21, at 633–34 (1982).  Even when all of the evidence is viewed in the light most favorable to C-Squared, no reasonable factfinder could determine that Oakes repudiated the contract on that basis.

According to C-Squared, it made a demand on August 13, 2018, that Oakes pay the required grower advances.  In support of that contention, C-Squared points to an August 13, 2018 text message that Chance Calloway sent to Veneziano stating, "We're out of money.  Need to know what we need to do.  Dad [Joe Calloway] wants a face to face.  Need you to call him." (Doc. 48-10, p. 23).  Veneziano replied, "I'm not advancing any more money.  You guys should not have farmed if you don't have

any money.  Absolutely ridiculous." *Id.*   C-Squared interprets this text message as notice that it was demanding payment of any past due advances while Oakes asserts that Veneziano was not referring to the grower advances in that statement.  Under either interpretation, the Court does not find this exchange to constitute a repudiation by Oakes.

First, the evidence shows that the parties continued to conduct business as they had prior to Veneziano's August 13, 2018 statement.  For example, in that same message thread, Chance Calloway and Veneziano continue to discuss their efforts to find lodging for the replacement harvesting crew.  On August 17, 2018, Calloway sends Veneziano a photograph of what appears to be a list of the different types of produce that had been grown along with the number of boxes that were harvested. Immediately after the picture was sent, Calloway stated, "It'll be there in the morning."  (Doc. 48-10, p. 24).  Further, in a different thread of text messages from August 15, 2018, Calloway told Veneziano that there had been rain the day before, but that C-Squared was going to harvest that day and the next.  (Doc. 48-12, p. 34). Calloway then tells Veneziano that "specialty peppers" are ready in the greenhouse and asks if Veneziano wants him to plant them.  Veneziano replied, "Doesn't matter to me.  Whatever you'd like to do." *Id.*  Thus, the evidence suggests that both parties believed that the agreement was still in force.  If C-Squared actually believed that

Oakes had repudiated when Veneziano said, "I'm not advancing any more money," it would not have continued to harvest produce and send it to Oakes.

Second, C-Squared's complaint, which was filed in the middle of the contract period, treats the contract as ongoing. For example, C-Squared alleged that Oakes breached the contract by its "failure to pay or refusal *to continue to pay* Plaintiff's grower advances." (Doc. 1, p. 15), *see also* (Doc. 1, p. 11)("Defendant failed to provide a replacement harvest crew *and continues to fail to do so*.)(emphasis added). Evidence of C-Squared's continued dealing with Oakes after August 13, 2018, along with its characterization of Oakes's conduct in the complaint demonstrate that C-Squared believed that the contract was still in force, i.e., that Oakes had not manifested an intent to refuse to perform its obligations. C-Squared has offered no evidence to show otherwise. Accordingly, there is no genuine dispute as to whether Oakes repudiated the contract. Thus, C-Squared had a duty to provide notice and an opportunity to cure. Insofar as C-Squared has alleged that Oakes repudiated the contract on this basis, summary judgment is due to be granted in favor of Oakes.

### b. Whether Oakes breached the contract

As to whether Veneziano's statement could have constituted a breach, thereby triggering a duty for C-Squared to give notice prior to rescission, the Court does find a factual dispute. There is no dispute that advances in the amounts of $25,000 were paid from April 1, 2018, to July 1, 2018. The contract provided that the advance on

July 15, 2018, was to be in the amount of $50,000, however, Oakes admits that it paid only $25,000.  According to Oakes, there was confusion between the parties regarding that particular payment that was never resolved.  As to the advances due on August 1, 2018, and August 15, 2018, Oakes makes two assertions.  First, it contends that C-Squared never sent any formal notices regarding those advances.  Second, it asserts that it actually advanced more than what was due during that time period because it was paying for C-Squared's non-harvesting labor costs that were not its responsibility under the contract.

As to the first contention, there is a dispute as to whether C-Squared made a demand for payment.  As noted above, on August 13, 2018, Chance Calloway sent a text message to Veneziano stating, "We're out of money.  Need to know what we need to do.  Dad [Joe Calloway] wants a face to face.  Need you to call him."  (Doc. 48-10, p. 23).  Veneziano replied, "I'm not advancing any more money."  *Id.*   C-Squared interprets this exchange to be a request on its behalf for Oakes to pay the grower advances that were due under the contract and an express refusal by Veneziano to do so.

Oakes on the other hand interprets the exchange to be its refusal to continue paying for non-harvesting labor for C-Squared, not a refusal to pay further grower advances.  According to Oakes, it had been paying C-Squared's employees an hourly wage for non-harvesting farm labor during the period of time after Deep South's

crews pulled out.  Oakes contends that because the crop yield was so low, there was a possibility that the workers, who were ordinarily paid by how much they harvested, would leave if there was not enough produce to pick.  Oakes asserts that it paid them an hourly wage for non-harvesting farm labor in order to keep them at the farm until the next crop was ready to be harvested.

Again, the text messages between Chance Calloway and Veneziano are instructive and give context to these statements.  On July 31, 2018, Calloway and Veneziano discussed payment to Deep South's harvesting crews as well as their crew's housing arrangements.  The following exchange occurred:

> [Calloway]: Jay [Deep South's employee] is talking about sending us pay roll.  He said he talked to you and I guess is still confused about who's paying the guys.  I told him we agreed to pay the motel when they weren't picking boxes.
>
> [Veneziano]: I just got off the phone with J[ay.] I explained again that the farm pays for hourly work not the sales agent[.] I'm not a partner in the farm[,] I am a partner in the sales and seed harvesting the profit and loss to the farm which is where the hourly work goes is not my responsibility[.] [T]hat is 100% at the farmers discretion for what that is. He said you both agreed on the motel when they aren't picking boxes. Let me call him and re clarify.  I think there's a misunderstanding because your farm is yours not mine.  It's your decision on all "farm related work" outside of harvesting.  I will call him to clarify now.  Hopefully everyone will be on [the] same page after that phone call.
>
> [Calloway]: So you're not going to float hourly work anymore?

(Doc. 48-12, p. 27).

It is clear from this conversation that Oakes had been advancing money to C-Squared to pay for hourly non-harvesting work.   Veneziano also explained this arrangement in his deposition.  (Doc. 48-9, Dep. of Veneziano, p. 452)("We helped C-Squared because their crop was very poor and the Deep South harvesters could not do a piece rate for the harvesting and we had helped in some capacity of helping them float some of their cash for the hourly work for these folks….").  Between the July 31, 2018 conversation and the August 13, 2018 conversation cited above, Calloway and Veneziano continued to discuss various aspects of the ongoing harvesting and sales.  For example, on August 8, 2018, the men had the discussion about the Deep South crews leaving and whether Oakes would find a replacement crew.

The Court cannot say with certainty which party's interpretation of the August 13, 2018 conversation is accurate.  While there is certainly evidence to suggest that Oakes had paid money to C-Squared that it was not obligated to pay and that Veneziano's statement referred to those payments, his statement, when viewed in the light most favorable to C-Squared, could also be interpreted as a declaration that Oakes intended to withhold future grower advances.   In other words, Chance Calloway's statement that C-Squared was "out of money," when viewed in the light most favorable to C-Squared, could be interpreted to be a request for grower advances that had yet to be paid.  The Court notes that this is a close question.  It is

impossible to accurately determine the meaning of Calloway's statement from briefs alone without being able to assess things like his credibility. Thus, summary judgment on that issue would not be proper.

Of course, C-Squared still had to give Oakes an opportunity to cure. Given that C-Squared filed suit on August 24, 2018, just 11 days after the purported notice, it certainly did not give Oakes very long to catch up on its payments. However, when viewed in the light most favorable to C-Squared, a reasonable jury could potentially find that to be sufficient.

Moreover, although Oakes claims that it paid Deep South $163,928 in non-harvesting-related labor, well more than what was due in grower advances, C-Squared disputes this amount. Thus, even if Veneziano's interpretation is correct, there is a dispute as to whether Oakes's advances for hourly labor were enough to cover what was due in grower advances. Accordingly, there is a genuine question of fact as to whether Oakes breached the contract by failing to pay grower advances on August 1, 2018, and August 15, 2018. There also appears to be a dispute as to whether Oakes paid the full amount due on July 15, 2018. When viewed in the light most favorable to C-Squared, a reasonable jury could find that Oakes failed to pay the required grower advances and that C-Squared put them on notice of the failure and gave them an opportunity cure. Accordingly, summary judgment is not

appropriate as to C-Squared's claim that Oakes breached the contract by failing to pay the required grower advances.

### B. C-Squared's remaining claims

The remainder of C-Squared's claims are all premised on one of two allegations: (1) that Oakes breached the contract by failing or refusing to provide harvesting crews beyond August 8, 2018; or (2) that Oakes failed to render accurate and detailed accountings as described in the contract.  For example, Count II of C-Squared's complaint alleges that, in violation of PACA, Oakes "failed or refused to provide harvesting crews or quality control personnel to harvest, grade, pack, or ship any of Plaintiff's Produce beyond August 8, 2020."  (Doc. 1, p. 16).  Count III contains a similar allegation.  Count V alleges that Oakes violated PACA by, among other things, making false statements regarding promises to provide Plaintiff with harvesting crews to harvest" the produce at issue.  (Doc. 1, p. 23).

One of the elements of a PACA violation is that a dealer "reject or fail to deliver in accordance with the terms of the contract *without reasonable cause* any perishable agricultural commodity."  7 U.S.C. § 499(b)(2).  Additionally, it is a violation of PACA

> For any commission merchant . . . to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is received in interstate or foreign commerce by such commission merchant …. to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with

whom such transaction is had; or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction…. However, this paragraph shall not be considered to make the good faith offer, solicitation, payment, or receipt of collateral fees and expenses, in and of itself, unlawful under this chapter.

7 U.S.C. § 499(b)(4).

Assuming without deciding that the parties meet the relevant definitions in PACA, e.g. "commission merchant," or "dealer," the Court nevertheless finds that summary judgment is appropriate. As described in the previous section, there is no genuine issue of material fact as to whether Oakes improperly removed the harvesting crews and quality control individual and failed to find a replacement. For the reasons explained above, there is no dispute as to whether Oakes made a false or misleading statement in that regard. As noted, C-Squared waived that requirement and has pointed to no evidence that would support its contention that Oakes violated § 499(b)(2) of PACA.

Further, the Court has determined that there is no genuine issue of material fact as to whether Oakes breached the contract by not strictly adhering to the requirement that it provide sales report updates every Friday. As noted above, Oakes's failure to follow that formality was in no way a repudiation of the contract. Therefore, C-Squared had a duty to provide Oakes notice and an opportunity to cure but failed to do so. Accordingly, C-Squared would be unable to prove an essential

element the PACA claim it raised under § 499(b)(4), and summary judgment is therefore due to be granted as to Counts II-V.

Count VI of C-Squared's complaint alleged that Oakes breached its fiduciary duty to C-Squared by: (1)"failing to harvest Plaintiff's Produce at the appropriate time," (2) "removing its harvest crews in the middle of a harvest period and failing to replace its harvest crew, causing Plaintiff to miss two harvesting rotations;" (3) "failing or refusing to continue harvesting Plaintiff's Produce;" (4) failing to pay Plaintiff the grower advances as agreed under the Agreement and failing to provide Plaintiff with a true and accurate account of each week's Produce transactions;" (5) failing "to ensure the timely harvest of Plaintiff's Produce;" (6) "removing its quality control personnel and harvest crews in the middle of harvesting rotations;" (7) "failing to provide Plaintiff with replacement quality control personnel and harvesting crews"; and (8) making false statements to Plaintiff regarding its Produce dealings with Plaintiff."  (Doc. 1, p. 25-28).  According to C-Squared, the fiduciary relationship arose out of Oakes's status as a grower's agent.

As explained in the previous section, the Court has determined that there exists a dispute as to whether Oakes made the required grower advances.  Thus, insofar as Count VI alleges that Oakes breached a fiduciary duty by failing to make those payments, its motion for summary judgment on that ground is due to be denied. However, for the reasons explained above, summary judgment is due to be granted

as to the remaining reasons because the Court has already determined that Oakes did not breach the contract by failing to replace the harvesting crews or the quality control individual.   All of the remaining claims are premised on one of those allegations.

In Count VII of C-Squared's complaint, it alleged a failure to render accounts. Count VII references PACA, but it is unclear to the Court whether C-Squared intended this claim to brought thereunder, or whether it was based on another state law theory.  Much of Count VII appears to be duplicative of allegations made in both the breach-of-contract claim and the PACA claims.  For example, C-Squared alleges that Oakes failed to satisfy its obligation to provide sales report updates every Friday. (Doc. 1, p. 30).  However, Count VII also alleges that Oakes has failed to provide accountings that would allow C-Squared to ascertain the amount of expenses that would be due or the amount of damages it allegedly incurred.  Those amounts would certainly have to be proven at trial.  However, for the reasons explained in Section IV(A)(3), summary judgment is due to be granted as to Count VII.

### C. Oakes's counterclaims

Oakes also filed six counterclaims alleging the following: fraudulent inducement (Count I), negligent misrepresentation (Count II), breach of contract (Count III), breach of fiduciary duty (Count IV), equitable accounting (Count V),

and unjust enrichment (Count VI).  (Doc. 13).  C-Squared has moved for summary judgment as to all six counts.  (Doc. 43).

C-Squared has pointed out that Oakes, in its response to the motion for summary judgment, failed to respond to its arguments as to why summary judgment should be granted as to Counts I, III, IV, V, and VI.  Indeed, a review of Oakes's response reveals that it addressed only C-Squared's motion as it related to Count II, the breach-of-contract claim.  Because Oakes failed to address C-Squared's claims regarding Counts I, III, IV, V, and VII, the evidence that C-Squared presented in support of its motion is considered uncontroverted.  *See Anderson*, 477 U.S. at 248 ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'").

However, the Court is nonetheless obligated to determine whether C-Squared is entitled to summary judgment on the undisputed facts.  Fed. R. Civ. P. 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion."  The Eleventh Circuit has held that "summary judgment, even when unopposed, can only be entered when 'appropriate.'"  *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004); *see also Trs.*

*of Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004) (per curiam) (A district court "cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion." (internal quotation marks omitted)).  Thus, the Court will address each claim in turn.

### 1. Fraudulent inducement

In its counterclaim, Oakes alleged that C-Squared made material false statements regarding its experience, resources, knowledge, and capacity to grow the produce at issue in its geographical area.  (Doc. 13, p. 32).  Oakes claimed that C-Squared knew its representations were false and intended the false representations to induce Oakes into entering the business relationship that forms the basis of this suit.  Further, Oakes alleged that it relied on the representations to its detriment.

Under Alabama law, fraudulent inducement consists of misrepresentation of a material fact "concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to… its detriment in executing a document or taking a course of action."  *Wells Fargo Bank, N.A. v. Trotman*, 940 F. Supp. 2d 1359, 1364 (M.D. Ala. 2013) (*quoting Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 461 (Ala. 2000) (emphasis in original)).  "[T]o prevail on a fraudulent inducement claim, [Oakes] must prove: (1) [C-Squared] had a duty to speak the truth; (2) [C-Squared] made a false representation of material fact; (3)

[Oakes] justifiably relied upon the false representation; and (4) as a proximate result, [Oakes] suffered loss, harm, or damage." *McGriff v. Minnesota Mut. Life Ins. Co.*, 127 F. 3d 1410, 1414 (11th Cir. 1997).

In its motion, C-Squared argued, among other things, that there was no genuine issue of material fact as to whether it made a false representation of material fact. In support of that contention, C-Squared pointed to evidence indicating that Oakes was aware of its inexperience in growing some of the produce that was the subject of their agreement. For example, C-Squared pointed to Veneziano's deposition in which he stated that he knew C-Squared had never grown eggplant before. *See* (Doc. 48-9, Dep. Of Veneziano, p. 202); *see also* (Doc. 48-9, p. 258)(acknowledging that Harrell told him of C-Squared's inability to grow eggplant); (Doc. 48-9, p. 259)("[Harrell] had told me they had grown jalapenos, but they hadn't grown any very niche varieties…."). This uncontroverted testimony could establish that Oakes knew about C-Squared's relative inexperience in growing certain types of produce. Thus, Oakes would not be able to prove an essential element of its fraudulent inducement claim, i.e., that C-Squared made a false representation of material fact. The Court therefore need not address whether Oakes could prove the remaining elements of its counterclaim. Accordingly, summary judgment as to Count I of Oakes's counterclaim is due to be granted.

## 2. Negligent misrepresentation

To survive summary judgment, a claim for negligent misrepresentation must establish "1) a misrepresentation of material fact, 2) made willfully to deceive, recklessly, without knowledge, or mistakenly, 3) which was reasonably relied on by the plaintiff under the circumstances, and 4) which caused damage as a proximate consequence." *Bryant Bank v. Talmage Kirkland & Co.*, 155 So. 3d 231, 238 (Ala. 2014). For the reasons discussed in the previous subsection, Oakes would be unable to prove that C-Squared misrepresented a material fact. Accordingly, summary judgment is due to be granted as to Count II of Oakes's counterclaim.

### 3. Breach of contract

C-Squared next moves for summary judgment as to Count III of Oakes's counterclaim for breach of contract. In its counterclaim, Oakes alleged that C-Squared breached the contract in one of two ways: (1) by treating the contract as continuing and refusing to allow Oakes to sell the produce that it grew during the remainder of the contract term, or (2) by improperly rescinding the contract on August 24, 2018, without giving Oakes notice and an opportunity to cure the perceived breach. It is undisputed that C-Squared severed communication with Oakes after it filed the present complaint, and it is further undisputed that Oakes did not sell any more of C-Squared's produce after that time. Thus, resolution of this claim depends on which party breached the contract and when.

C-Squared moves for summary judgment as to Oakes's breach-of-contract claim by arguing that it was Oakes who breached the contract by (1) failing to replace the quality control individual, (2) ceasing harvesting operations, (3) failing to provide weekly accountings, and (4) failing to issue scheduled grower advances.

However, as discussed at length in Section IV(A) above, there is no genuine dispute that Oakes did not breach the contract in the first three ways.  Further,  as noted, there is no dispute that, although Oakes's failure to pay the grower advances in July and August of 2018 could constitute a breach, it did not constitute a repudiation of the contract.  However, there is a dispute as to whether C-Squared gave Oakes notice that it considered the alleged non-payments to be a breach of the contract, and whether C-Squared gave Oakes an opportunity to cure the breach.

If Oakes's non-payment was a breach, and if C-Squared is found to have given Oakes notice and an opportunity to cure, then a jury could find that Oakes failed to perform its obligations under the contract, i.e., that it failed to pay the required grower advances.  In that case, C-Squared could have rescinded.  However, if it is determined that C-Squared did not give Oakes notice and an opportunity to cure, then a jury could find that C-Squared's decision to file suit and sever all communications was a repudiation of the contract.  In that case, Oakes's further performance would be excused.  As noted, resolution of this fact will depend, at least

in part, on a jury's interpretation of the August 13, 2018 conversation between Chance Calloway and Veneziano.

Accordingly, for the reasons stated in Section IV(A)(4) above, there is a genuine dispute as to a material fact regarding which party breached the contract. Therefore, summary judgment is due to be denied as to Count III of Oakes's counterclaim.

### 4. Breach of fiduciary duty

C-Squared next moves for summary judgment as to Oakes's breach-of-fiduciary-duty claim.  In its counterclaim, Oakes alleged that a fiduciary duty existed on C-Squared's behalf because, it said, Oakes and C-Squared formed a partnership by entering into their business arrangement.  (Doc. 13, p. 35).  In its motion for summary judgment, C-Squared argued that a partnership did not exist and, therefore, it had no fiduciary duty as alleged by Oakes.

Under Alabama law, the essential elements of breach of fiduciary duty are (1) the existence of a fiduciary relationship between the parties; (2) breach of the duty; and (3) damages resulting from the breach.  *Regions Bank v. Lowrey*, 101 So. 3d 210, 219 (Ala. 2012).  A fiduciary relationship must exist for fiduciary duties to arise between parties.  *Swann v. Regions Bank*, 17 So. 3d 1180, 1189 (Ala. Civ. App. 2008).  Oakes alleged that fiduciary duties arise from a partnership between C-

Squared and Oakes.  (Doc. 13, p. 35).  According to C-Squared, no partnership existed.

While it is true that the contract references a "partnership," merely stating that a partnership exists is insufficient to create one.  In Alabama, a partnership is only created where "two or more persons … carry on as co-owners a business for profit ... whether or not the persons intended to form a partnership[.]" Ala. Code § 10A-8A-2.01(a)(1) (1975).  "Where there was no written partnership contract and no express agreement between the parties for the creation of a partnership, whether a partnership existed must be determined from the character and conduct of the business and the intent of the parties as gathered from the attending circumstances." *Bailey v. Bailey*, 345 So. 2d 304, 308 (Ala. Civ. App. 1977).  A critical factor in determining whether a partnership exists is "whether the parties have agreed to share the losses as well as the profits."  *Id.*  Specifically, a partnership does not exist where a person receives payment "for services as an independent contractor." Ala. Code § 10A-8A-2.01(c)(3)(ii) (1975).

According to C-Squared, no partnership existed because the two parties were separate businesses for separate purposes with no shared management or control.  C-Squared was in the business of growing produce, and Oakes was in the business of marketing and selling it.  Additionally, C-Squared asserts that no profit/loss sharing was contemplated, and that Oakes was compensated as a sales agent, by a fixed

commission, for selling C-Squared's produce.  As noted, Oakes did not respond to this argument.  Thus, the Court will accept these factual allegations as true for purposes of summary judgment.  Indeed, the record supports these assertions. Accordingly, the Court finds no dispute that a partnership did not exist between the parties.  As such, no fiduciary duties were created on that basis, and Oakes would not be able to prevail on its breach-of-fiduciary-duty claim.  Therefore, summary judgment is due to be granted as to Count IV of Oakes's counterclaim.

### 5.  Equitable accounting

In its counterclaim for equitable accounting, Oakes alleged that "C-Squared, as a partner under the Business Arrangement, owed Oakes a fiduciary duty to account for the financial profits and losses of the Business Arrangement."  (Doc. 13, p. 38).  Thus, in order to prevail on this claim, Oakes would have to prove that a partnership and a fiduciary duty existed.  As described above, Oakes cannot do so. Accordingly, summary judgment is due to be granted as to Count V of Oakes's counterclaim.

### 6.  Unjust enrichment

Finally, Oakes asserted a claim of unjust enrichment.  According to Oakes, "C-Squared holds money which, in equity and good conscience, belongs to Oakes." (Doc. 13, p. 38).  Oakes asserted that C-Squared has unjustly profited from the retention of that money.

Under Alabama law, "[n]o cause of action for unjust enrichment is cognizable where, as here, there is an express contract between the parties." *Wells Fargo Bank, N.A.*, 940 F. Supp. 2d at 1369. "Unjust enrichment claim sounds in the nature of quasi-contract, as the law equitably implies a contract between the parties to prevent the unjust enrichment of a defendant at the expense of a plaintiff." *White v. Microsoft Corp.*, 454 F. Supp. 2d 1118, 1132 (S.D. Ala. 2006). Where "claims sounding in both express contract and quasi-contract as to the same subject matter, Alabama courts have deemed the quasi-contract claim not to be cognizable." *Id*. at 1133. "The reasoning is simple: If the parties' dealings are covered by an express agreement, then there is no need to imply an agreement between them to ward off inequitable results." *Id*.

As noted, neither party disputes that a valid, express contract exists in this case. In fact, both parties' surviving claims depend on it. Therefore, Oakes's unjust enrichment claim is not cognizable, and summary judgment is due to be granted as to that count.

## V.     Conclusion

For the foregoing reasons, Oakes's motion for summary judgment (Doc. 40) is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** as to Counts II-V and Count VII of C-Squared's complaint, and those counts are **DISMISSED WITH PREJUDICE**. As to Count I, the motion is **DENIED** insofar

as it relates to C-Squared's contention that Oakes breached the contract by failing to pay the grower advances due under the contract.  The motion is **GRANTED** with respect to the remaining allegations of Count I.  As to Count VI, the motion is **DENIED** insofar as it relates to C-Squared's allegation that Oakes breached its fiduciary duty by failing to pay the grower advances due under the contract.  The motion is **GRANTED** with respect to the remaining allegations of Count VI.

Additionally, C-Squared's motion for summary judgment (Doc. 43) is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** as to Counts I, II, IV, V, and VI of Oakes's counterclaim, and those counts are **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** as to Count III of Oakes's counterclaim.

**DONE** and **ORDERED** October 13, 2020.

_____

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE